# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 23-cr-431 (JEB)** |
| **v.** | : | |
| | : | |
| **FRANCIS BIONDO,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Francis Biondo to 15 days of incarceration with 12 months' supervised release to follow. The government also requests that this Court impose 60 hours of community service, and, consistent with the plea agreement in this case, $500 in restitution.

## I.      Introduction

Defendant Francis Biondo, a 58-year-old veteran of the United States Army, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

Biondo pled guilty to a violation of 18 U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds). Fifteen days of incarceration for that conviction is warranted here: Biondo entered the United States Capitol building despite obvious signs that he should not, remained in the building for over half an hour, and then stayed even longer on the restricted Capitol grounds.

The Court must also consider that Biondo's conduct on January 6, like the conduct of scores of other defendants, took place in the context of a large and violent riot that relied on numbers to overwhelm police, breach the Capitol, and disrupt the proceedings. But for his actions alongside so many others, the riot likely would have failed. Here, the facts and circumstances of Biondo's crime support a sentence of 15 days of incarceration and 12 months of supervised release.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF No. 1.

### Defendant Biondo's Role in the January 6, 2021 Attack on the Capitol

On January 5, 2021, the defendant travelled from his home near Richmond, Virginia, to Washington D.C.  He planned to attend a rally and speech by former President Trump.  While in D.C., Biondo met up with an acquaintance from the army, Jeffrey Etter.[2]

---

[2] Jeffrey Etter was charged for his actions on January 6, 2021, in Case No. 23-CR-95 (RBW).  He pled guilty to one count of violating 40 U.S.C. § 5104(e)(2)(G) and was sentenced to 36 months of probation. Etters' case is discussed more fully in Section V.E regarding sentencing disparities.

Together, Biondo and Etter walked from the rally toward the United States Capitol amongst a large crowd.  Along the way, Biondo held the edge of a large American flag, and carried a selfie-stick with a phone attached to it.



*Fig. 1 – A still photo from open-source video of Biondo (yellow circle) and Etter (green circle) walking toward the U.S. Capitol with a large American Flag.*

Biondo and Etter approached the Capitol Building from the west.  They walked through the lower west terrace, winding their way to the upper west terrace, where they eventually approached the Senate Wing Doors.  Surveillance video from the Capitol shows that, at approximately 2:56 p.m., Biondo and Etter entered the building through the Senate Wing Doors.  By this time, the building was overrun with rioters.  The windows flanking the Senate Wing Doors, as well as the windows on the doors themselves, had been shattered.  The building's alarms were

audibly sounding.   Many rioters entering and exiting the building were wearing body armor, helmets, facemasks, goggles, and were carrying other items such as flags, poles, and bullhorns.

As Biondo and Etter entered, Biondo held out his selfie-stick, in an apparent attempt to record the chaos.   Rioters were streaming in through both the doors and the broken windows.   Open source video also shows that a small group of police officers in riot gear were standing nearby. The officers were outnumbered by the rioters by a large margin and were not able to stem the flow of people entering the building.   At this time, the crowd also began chanting loudly, the words "Traitors," and some in the crowd yelled, "Our House."



*Fig. 2 – A still from surveillance video of Biondo (small yellow circle) entering the Senate Wing Door with a selfie stick (large yellow circle).*

Biondo and Etter moved from the Senate Wing Doors toward the Crypt.  They walked around the area for several minutes, but primarily stood in the Crypt observing other rioters who were yelling and waving flags.



*Fig. 3 – A still from surveillance video of Biondo walking through the Crypt.*

As they stood in the Crypt, Biondo and Etter chanted, "USA, USA, USA" with a group of other rioters while filming on their phones.

5



*Fig. 4 – Biondo standing in the Crypt chanting "USA!"*



*Fig. 4 – A still from open source video of Biondo (yellow circle) and Etter (green circle) in the Crypt.*

At approximately 3:30 p.m., Biondo and Etter walked back from the Crypt toward the Senate Wing Doors.  Instead of exiting through the doors, the pair exited through one of the broken windows.  Etter paused briefly in the window for Biondo to take a photo of the moment. In total, the pair were in the building for approximately 35 minutes.



*Fig. 5 – A still from open source video of Biondo (yellow circle) photographing Etter (green circle) as Etter straddles a broken window at the Senate Wing Doors.*

After leaving the building, Biondo and Etter continued to linger on the Upper West Terrace.



*Fig. 6 – A still photo from open source video of Biondo (yellow circle) and Etter (green circle) together on the Upper West Terrace.*

Around this time, police officers arrived and attempted to expel rioters from the area. The crowd was ordered to leave and crowd-control tactics, such as OC spray, were eventually deployed. Video from this time shows that Etter became aggressive with the police, and Biondo restrained Etter from engaging in physical violence.



*Fig. 7 – A still photo from body worn camera of Etter confronting police officers while Biondo pulls him back.*

However, even after this altercation and despite clear indications that they should not be there, the pair did not leave the Capitol Grounds and continued to linger in the area.  At one point, Biondo stopped to pose for a photo – smiling with shrugged shoulders, in front of a line of police officers in riot gear.



*Fig. 8 – A photo from open source video of Biondo (yellow circle) posing in front of a line of police officers in riot gear while Etter (green circle) photographs him.*

*Defendant's Interview*

In an interview with the FBI, Biondo admitted that he was in Washington D.C. on January 6, 2021. He stated that he travelled to D.C. for the protest, and though he did not plan to march to the Capitol, he ended up following the crowd from the Washington Monument to the Capitol building. Biondo stated he recalled being shot with pepper spray and felt trapped in the crowd but, due to a car accident, he had no recollection of whether or not he went into the Capitol building. He stated he supports law enforcement.

Biondo did not express remorse in his interview with the FBI. No expressions of remorse are noted in his Pre-Sentence interview. PSR ¶ 33. To date, the government has received no

information indicating that Biondo is remorseful for his actions or understands the gravity of his role on January 6 or the significance of the events of that day.

*The Charges and Plea Agreement*

On December 12, 2023, the United States charged Biondo by a four count information for violating 18 U.S.C. § 1752(a)(1) (Entering and Remaining in a Restricted Building or Grounds), 18 U.S.C. § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds), 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct on Capitol Grounds), and 40 U.S.C. § 5104(e)(2)(G) (Parading, Demonstrating, or Picketing in a Capitol Building). On May 24, 2024, pursuant to a plea agreement, Biondo pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. § 1752(a)(1). By plea agreement, Defendant agreed to pay $500 in restitution to the Architect of the Capitol.

## III.    Statutory Penalties

Biondo now faces sentencing for violating 18 U.S.C. § 1752(a)(1).  As noted by the plea agreement and the U.S. Probation Office, Biondo faces up to one year of imprisonment and a fine of up to $100,000. He must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

## IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual

sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR.

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | -2 |
| Zero Point Offender (USSG § 4C1.1(a)(1)-(9)) | -2 |
| Total Adjusted Offense Level | 2 |

*See* PSR at ¶¶ 34-43.

While the Government concedes that Section 4C1.1 applies to Biondo, the Court should vary upward by two levels to account for the reduction under 4C1.1. An upward variance is necessary because the January 6 riot was a violent attack that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, did irrevocable harm to our nation's tradition of the peaceful transfer of power, caused more than $2.9 million in losses, and injured more than one hundred police officers. Every rioter, whether or not they personally engaged in violence or personally threatened violence, contributed to this harm. *See, e.g., United States v. Rivera*, 21-cr-60 (CKK), ECF No. 62 at 13 ("Just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood. Only when all of the floodwaters subside is order restored to the field. The same idea applies in these circumstances. Many rioters collectively disrupted congressional proceedings and each individual rioters contributed to that disruption. Because [the defendant's] presence and conduct in part caused the continued interruption to Congressional proceedings, the court concludes that [the defendant] in fact impeded or disrupted the orderly conduct of Government business or official functions"). Thus the defendant's conduct caused a significant disruption to a vital governmental function, warranting an upward variance. *See United States v. Eicher*, No. 22-cr-038 (BAH), Sentc'g Hrg.

Tr. at 48 (varying upward by two levels to offset the Section 4C1.1 reduction).

Although the provision took effect after January 6, 2021, the Sentencing Commission enacted § 4C1.1 based on recidivism data for offenders released in 2010. *See* U.S. SENT'G COMM'N, RECIDIVISM OF FEDERAL OFFENDERS RELEASED IN 2010 (2021), available at https://www.ussc.gov/research/research-reports/recidivism-federal-offenders-released-2010. Given the unprecedented nature of the Capitol attack, there is no reason to believe this historical data is predictive of recidivism for defendants who engaged in acts of political extremism on January 6. This is particularly so given the degree to which individuals, including defendants who have been sentenced, continue to propagate the same visceral sentiments which motivated the attack. *See, e.g.*, *United States v. Little*, No. 21-cr-315 (RCL), ECF No. 73 at 4 ("The Court is accustomed to defendants who refuse to accept that they did anything wrong. But in my thirty-seven years on the bench, I cannot recall a time when such meritless justifications for criminal activity have gone mainstream.").

The U.S. Probation Office calculated Biondo's criminal history as a 0, putting him at a criminal history category of I. PSR at ¶ 46. Accordingly, the U.S. Probation Office calculated Biondo's total adjusted offense level, after acceptance, at 2, and his corresponding Guidelines imprisonment range at 0-6 months' imprisonment. PSR at ¶ 114. Biondo's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 15 days' incarceration, 12 months' supervised release, and 60 hours of community service.

### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While evaluating Biondo's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Biondo, the absence of violent or destructive acts is not a mitigating factor. Had Biondo engaged in such conduct, he would have faced additional criminal charges.

The nature and circumstances of Biondo's actions contain both aggravating and mitigating facts.  As to the mitigation, in at least one instance, Biondo intervened to prevent violence as Jeffrey Etter was confronting police officers on the Upper West Terrance.

However, there are several aggravating circumstances here as well. First, Biondo approached and entered the Capitol Building via the Upper West Terrace and Senate Wing Door. At the time he was entering, it was eminently clear that he should not enter. Mobs of rioters were pouring in through the doors and broken windows. People were stepping over broken glass and debris strewn through the hallways. Many were adorned with body armor, masks, goggles, flags, poles and other items. They chanted things such as "Our House" and told the police they were "traitors" over the sound of a blaring alarm. He produced a selfie-stick to document his walk through the Capitol building and took photos of his friend posing in the frame of the busted-out Senate Wing window.  Additionally, Biondo's statement to the FBI that he had great respect for law enforcement seems to ring hollow when taken in context of Biondo's actual actions on January

6. At multiple points during his time on the Capitol Grounds, Biondo saw police officers struggling against the violent and unruly crowd. He was directed to leave, even shot with pepper spray. Yet he treated the officers' presence that day as a joke – posing in a cartoonish manner for a photo in front of a line of officers in riot gear with his arms raised and his shoulders shrugged. *See* Figure 8, *supra*. This was not the attitude of someone who respects law enforcement.

Accordingly, the nature and the circumstances of this offense establish the clear need for a sentence of incarceration in this matter.

### B. Biondo's History and Characteristics

Unlike many defendants that appear before this Court, Biondo's history and characteristics present no significant mitigating factors. As set forth in the PSR, Biondo grew up in a stable household with two parents and his siblings. PSR ¶ 61. After he obtained his GED, (PSR ¶ 81), Biondo served in the United States Army for 20 years. PSR ¶ 83. He reported being twice married and divorced, (PSR ¶¶ 64-65), and reported that a child resulted from each marriage. *Id.* Despite being divorced, Biondo reported that he successfully co-parented both of his children and both are now adults. PSR ¶ 66. Biondo has no criminal history, (PSR ¶ 45), nor substance abuse issues. PSR ¶ 78. He has a stable employment history and reported that he currently has multiple part-time jobs. PSR ¶¶ 86-87. Based on the information provided in the PSR, it appears that Biondo is an educated person, with stable living conditions, good habits, and steady employment. His prior service in the Army is laudable, though his behavior on January 6 in light of his military service is troubling. However, in total, it does not appear that Biondo's history and characteristics provide any particularly aggravating or mitigating reasons to vary either upward or downward in this case.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot.  *See United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

## D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Biondo did not personally assault police or destroy property, but that does not lessen the need for specific deterrence here. As this Court has recognized regarding January 6 defendants who did not personally attack officers or damage property,

> while . . . you didn't assault anyone, you didn't destroy anyone, you didn't steal anything, you were part of that mob. And a mob is only a mob if it has numbers. If it is three people or five people or seven or fifty, they don't get anywhere because the Capitol Police is able to resist them.

*United States v. Cynthia Ballenger and Christoper Price*, 1:21-cr-719 (JEB), Tr. At 54. And Biondo did not merely enter the Capitol Building himself. He acted intentionally at every turn – he marched to the Capitol, he crossed the lawn, making his way across the west plaza, and up to the Upper West Terrace, despite clear signs that the mob was out of control and that he was not supposed to be there.  He entered the building through the broken doors, and even after leaving, remained in the area despite clear signs from the police that he needed to leave.  Especially now, as we face an upcoming presidential election, it must be made clear to Biondo, regardless of the outcome of future political events, that he cannot ever engage in this type of criminal behavior again.  A sentence of 15 days' imprisonment would serve to send that message.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers.[3]  This Court must sentence Biondo based on his own

---

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Biondo has pleaded guilty to Count One charging him with Entering or Remaining in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(1). This offense is a Class A misdemeanor. 18 U.S.C. § 3559.The sentencing factors set forth in 18 U.S.C. § 3553(a) require this Court to consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

The most obvious case comparison to Biondo is that of his cohort, Jeffrey Etter. *United States v. Jeffrey Etter*, 23-cr-95 (RBW). Though the two were not charged in the same Information, Biondo and Etter were together on January 6 for a majority of the day. On May 15, 2023, Etter pled guilty to one count of 40 U.S.C. § 5104(e)(2)(G). 21-cr-95, ECF No. 21. On August 18, 2023, in *United States v. Little*, 78 F.4th 453 (D.C. Cir. 2023), the D.C. Circuit held that a single petty offense may not be sentenced to both imprisonment and probation for the same offense. *Id.* at 454. On September 12, 2023, Judge Walton sentenced Etter to 36 months' probation with 400 hours of community service. Given the *Little* decision, the court was forced to choose between monitoring the defendant and a term of imprisonment. While Judge Walton expressed that incarceration was deserved, he believed supervision was more necessary for Etter.

18

Biondo's case does not present the same limitation to the Court's sentencing power as Etter's case.  The Court can fashion an appropriate sentence using both incarceration and supervisory tools.  Therefore, in considering the sentencing recommendation here, the Government examined three similar cases: (1) *United States v. Jordan Revlett,* 21-cr-281 (JEB); (2) *United States v. Lawrence Dropkin, Jr.*¸ 23-cr-734 (JEB); and (3) *United States v. Suzanne Ianni*, 21-cr-451 (CJN).

Jordan Revlett also approached the Capitol from the west, but entered through the Upper West Terrace Doors.  He recorded his actions on his phone and posted the videos on social media. Revlett paraded through the Capitol building for approximately 30 minutes, and while inside he chanted "Let us through!" at police officers who were attempting to clear the area.  During his FBI interview, Revlett admitted to going inside, but attempted to deflect responsibility and claimed he was allowed to be there because the police invited him into the building. Revlett pled to one count of 40 U.S.C. § 5104(e)(2)(G).  The Court imposed 14 days' imprisonment, 12 months' probation, and 80 hours of community service. 21-cr-281 (JEB), ECF No. 46.

Lawrence Dropkin also approached the Capitol grounds from the west and entered the building through the Senate Wing Doors.  At the time Dropkin entered, he too would have seen broken windows, debris, and officers attempting to stop the crowds from entering.  Despite this, he paraded through multiple areas of the Capitol for approximately one hour, used his cellphone to record the riot, and observed altercations between rioters and police officers.  He pled guilty to four counts: 18 U.S.C. § 1752(a)(1), 18 U.S.C. § 1752(a)(2), 40 U.S.C. § 5104(e)(2)(D) and 40 U.S.C. § 5104(e)(2)(G).  The Court imposed 30 days' imprisonment, 12 months' supervised release, and 60 hours of community service.  21-cr-734 (JEB), ECF No. 30.

Similar to Biondo and Dropkin, Suzanne Ianni also approached the Senate Wing Doors. She observed rioters breaking the windows in that area and joined in chanting, "Fight for Trump!" as rioters began accessing the Capitol building. She eventually entered the building herself and was part of a group that pushed past police officers inside. In total, Ianni was in the building for approximately 23 minutes; she did not express remorse for her actions. She pled guilty to one count of 40 U.S.C. § 5104(e)(2)(D). At sentencing, Judge Nichols stated,

> [I]n my view, Ms. Ianni is average or slightly below average in terms of severity and culpability as compared to others who have been sentenced for the same or similar charges thus far, and not to repeat myself too much, but as to her conduct the day of January 6th, I find that as with respect to the cohort of people I'm talking about -- that is to say, people who have pled guilty and been sentenced to the (e)(2)(D) or (e)(2)(G) charges -- her conduct was in the middle of the pack. She was inside the Capitol for longer than a substantial amount of other defendants. She participated in a crowd that overwhelmed the police line. On the other hand, she did not enter particularly sensitive areas, and nothing she did can be fairly characterized as directly aggressive herself toward police or intending property destruction. Given  her -- in what my view is her culpability compared to other defendants charged with and sentenced for similar crimes, a more severe sentence than average is not appropriate, but neither is a sentence at the very, very low end.

21-cr-451 (CJN), Snt. Tr. 32-33. Judge Nichols imposed 15 days' imprisonment, 30 months' probation, and 60 hours of community service.

Biondo's case is similar to all three of the defendants listed above. In the simplest terms, Biondo traversed the Capitol grounds where he would have encountered multiple signs that he should not be there. He entered the Capitol building – again ignoring obvious signs that he was trespassing, and bypassed police officers in the vicinity. Biondo filmed, paraded through the building, and joined in chanting with other rioters. Biondo remained in the area and though he did prevent some violence – he also did not clear the grounds and treated the police presence as a joke, posing for photos in front of officers in full riot gear. Biondo did not express remorse to the FBI

but instead deflected responsibility.  He did not make any statements of remorse in his PSR interview.  Like Judge Nichols' stated at Ianni's sentencing, Biondo's actions present as average in terms of culpability and severity.  He should be sentenced accordingly – to an average sentence, commensurate with Revlett, Dropkin, and Ianni, who were similarly situated.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[4] Generally, restitution under the VWPA must "be tied to the loss

---

[4] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense

caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Biondo must pay $500 in restitution, which reflects in part the role Biondo played in the riot on January 6.[5] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023." *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Biondo's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 133.

## VII.   Fine

Biondo's conviction for violating 18 U.S.C. § 1752(a)(1) subjects him to a statutory maximum fine of $100,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial

---

[5] against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C.  § 3663A(c)(1).

[5] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, Biondo's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

## VIII.   Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence the defendant to 15 days' incarceration, 12 months' supervised release, 60 hours of community service, and order him to pay $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on Biondo's liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     s/ *Allison K. Ethen*
Allison K. Ethen
Assistant United States Attorney
Capitol Seige Detailee
MN Bar 0395353